**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| QUORUM HEALTH CORPORATION, *et al.*, | Case No. 20-10766 (KBO) |
| Debtors.[1] | Jointly Administered |
|  | **Re: D.I. 21 & 22** |

**MUDRICK CAPITAL MANAGEMENT, L.P.'S
PRELIMINARY OBJECTIONS TO (I) APPROVAL OF
DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED
CHAPTER 11 PLAN OF REORGANIZATION AND (II) CONFIRMATION OF
DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

Mudrick Capital Management, L.P. ("Mudrick"), beneficial owner of approximately 15% of the equity securities of Quorum Health Corporation ("QHC" and together with the above-referenced debtors and debtors in possession, the "Debtors"), hereby submits these preliminary objections (the "Preliminary Objections") to (i) approval of the *Disclosure Statement for the Debtors' Joint Prepackaged Plan of Reorganization* [D.I. 22] (the "Disclosure Statement") and (ii) confirmation of the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* [D.I. 21] (the "Plan").

## PRELIMINARY STATEMENT[2]

The Debtors are solvent. They were solvent when they filed bankruptcy and they are much more solvent today. Rather than recognize this solvency and provide for a meaningful

---

[1] The last four digits of Quorum Health Corporation's tax identification number are 5208. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Quorum. The location of Quorum Health Corporation's corporate headquarters and the Debtors' service address is 1573 Mallory Lane, Brentwood, Tennessee 37027.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan and Disclosure Statement.

equity recovery, the Plan wipes out the equity holders and transfers the equity value – hundreds of millions of dollars – to the Noteholders.  The Debtors attempt to accomplish this illegal diversion – a clear violation of the absolute priority rule – through an indefensibly low total enterprise valuation, negotiated with the very Noteholders taking 100% of the New Common Stock, 100% of the right to buy new equity, 100% of the 7.5% premium on such right, and 100% of the QHC Litigation Trust Interests.  Remarkably, both in the Plan valuation and the liquidation analyses, the Debtors completely (and inexplicably) ignore the value of the QHC Litigation Trust Interests as well as the right to buy new equity and the premium on such right.  It is quite clear that under the Plan the Noteholders are receiving more than payment in full while the equity holders are recovering zero – an amount substantially less than the value of their interests.  These two stark violations of absolute priority in a cramdown plan require denial of confirmation.

The Debtors filed the Plan on April 8, 2020, as required by the Restructuring Support Agreement ("RSA"), signed two days before.  Even though Mudrick contends that the Debtors were solvent at that time, much has changed in the three weeks since then.  Federal governmental action in just the last week has markedly and materially increased the Debtors' value.  The Debtors' flawed valuation propping up the Plan is now factually and legally stale.  The CARES Act Provider Relief Fund, increased by $75 billion last week in the Health Care Enhancement Act passed by Congress, now provides $175 billion in grants, not loans, for hospitals and other providers, including the Debtors.  Prior to last week's increase, HHS had already disbursed $30 billion on the basis of providers' 2019 Medicare fee-for-service revenue.  Of this, HHS granted the Debtors $19.2 million in cash, or 0.06% of the initial $30 billion distribution – a material cash asset that is not accounted for in the Debtors' valuation.

While the exact distribution methodology for the remaining $145 billion of grants is not yet fully known, conservatively assuming the Debtors receive the same 0.06% distribution of this forthcoming $145 billion, the Debtor will receive an additional $112 million.  Critically to the benefit of the Debtors, on April 22, 2020, HHS announced that $10 billion of the remaining $145 billion would be allocated to rural hospitals.[3]  Mudrick estimates that the Debtors stand to garner at least an additional $127 million to $146 million in grant money just from these earmarked funds – with significant additional funds forthcoming from the remaining $135 billion still to be granted.

<u>All in, depending on the Debtors' requests and the final grant amounts, the Debtors may receive hundreds of millions of dollars that they had no expectation of getting when they negotiated the RSA and filed the Plan</u>.  Although the Debtors were unaware of the full amount of the cash infusion coming their way, to date, none of that value is in the Debtors' valuation, none goes to equity, none of the underlying facts have been disclosed, and the Debtors have yet to exercise their much-touted "fiduciary out" from the RSA to rebalance the Plan in recognition of the undeniable equity value.[4]

It is plain that the Debtors should terminate the RSA and withdraw the Plan.  Mudrick has written to the Debtors' Board and implored that it do so.  As stated, the RSA contains the "fiduciary out" (termed a "broad 'fiduciary out'" by the Debtors[5]), precisely for these circumstances.  Hopefully, QHC's Board will exercise its fiduciary duties properly and the Court will not need to address these Preliminary Objections.  However, if the Court does have to

---

[3]     U.S. DEP'T OF HEALTH AND HUMAN SERVICES, HHS Announces Additional Allocations of CARES Act Provider Relief Fund (Apr. 22, 2020), *available at* https://www.hhs.gov/about/news/2020/04/22/hhs-announces-additional-allocations-of-cares-act-provider-relief-fund.html.

[4]     RSA, ¶¶ 8(b), 14(b).

[5]     Disclosure Statement, p. 21.

address confirmation, in addition to the fatal absolute priority flaws, the Court must deny confirmation for the independent reason that the Plan contains an impermissible "opt-out plus" mechanism.  The Debtors seek to force shareholders – who are receiving nothing under the Plan, are deemed to reject it, and barely received notice (without the Disclosure Statement) – *to file a Plan objection* if they wish not to be bound by third-party releases.  This Court has recently denied confirmation of a plan that contained a much less offensive requirement of completing an opt-out form, holding that it cannot be a substitute for actual consent to be bound by third-party releases.[6]  Here it is worse; the Plan is the antithesis of due process.

Since the Petition Date, Mudrick has sought to collect information from the Debtors and RSA parties concerning the Debtors' valuation thesis and other pertinent issues (but has received nothing to date).  However, even without all relevant information, it is clear that the Court cannot confirm the Plan.

## BACKGROUND

1.      On April 7, 2020 (the "Petition Date"), the Debtors filed a Voluntary Petition for Non-Individuals Filing Bankruptcy under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), and disclosed their entry into an RSA with certain lenders representing approximately 74.7% of the obligations outstanding under the Debtors' First Lien Credit Facilities and 97.3% of the obligations outstanding under the Senior Notes.

2.      The Debtors filed their Plan on April 8, 2020.  Pursuant to the Plan, there are ten classes of claims and interests and only two of which are deemed impaired and entitled to vote: the First Lien Lenders and the Noteholders.  All allowed administrative claims, priority tax claims, other secured claims, and other priority claims will receive payment in full in cash or

---

[6]      *In re Emerge Energy Servs. LP*, Case No. 19-11563 (KBO), 2019 Bankr. LEXIS 3717, at *53 (Bankr. D. Del. Dec. 5, 2019).

such other treatment to render the claims unimpaired.  Allowed DIP claims, ABL claims, and the general unsecured claims will receive similar treatment.  Each Holder of an Allowed First Lien Loan Claim shall receive such Holder's pro rata share of:  (a) the First Lien Loan Claims Paydown Amount; and (b) the Exit Facility.  Senior Notes Claims will be discharged in exchange for their *pro rata* share of 100% of the New Common Stock, subject to dilution for certain issuances of New Common Stock, and QHC Litigation Trust Interests.  Though the Debtors will reinstate all general unsecured creditors and will pay them in the ordinary course of business, the Plan provides zero recovery to QHC's pure shareholders, *i.e.* those shareholders that do not also own Senior Notes.  Thus, the Plan provides that all existing equity will be wiped out and all New Common Stock will be provided to QHC's Noteholders.

3.    On April 9, 2020, Mudrick filed its *Preliminary Omnibus Objection to Certain First Day Motions* [D.I. 80] with this Court, requesting that the Court reject as unnecessary the expedited confirmation schedule sought by the Debtors to provide sufficient time for the United States Trustee to consider appointment of an official committee of equity security holders (an "Official Equity Committee")[7], and for the equity to evaluate the Plan and the underlying valuation support.  Mudrick further requested that the Court enter interim relief solely to the extent necessary to preserve the Debtors' estates and refrain from granting any relief that needlessly locked the Debtors into a path forward prior to a final hearing.

4.    The Court conducted a hearing that same day on April 9, 2020 (the "First Day Hearing").  With respect to scheduling, the Court set the Combined Hearing for May 22, 2020,

---

[7]    To date, the United States Trustee has not appointed an Official Equity Committee.  However, in his letter, he specifically "reserve[d] the right to revisit this determination in the future if new facts develop."  Letter dated April 22, 2020.  Plainly, the Debtors' entitlement to enhanced CARES funds that may amount to hundreds of millions of dollars is a "new fact."  Accordingly, Mudrick has renewed its request for an Official Equity Committee.  Also, due to the Debtors' current accelerated timeframe, Mudrick is simultaneously moving this Court for appointment of an Official Equity Committee.

but cautioned that if "there is a serious objection that is filed or an appointment of a[n equity] committee, then the timeline will most likely be reconsidered." *See* 04/09/20 Hrg. Tr. at pp. 92, 95-96.

5.     On April 15, 2020, Mudrick served its First Request For Production to the Debtors, as well as Subpoenas to Produce Documents to some of the First Lien Lenders and Noteholders, including Davidson Kempner Capital Management LP ("Davidson Kempner"), KKR Credit Advisors (US) LLC ("KKR"), GoldenTree Asset Management LP ("GoldenTree"), Goldman Sachs Group, Inc. ("Goldman Sachs"), Oak Hill Advisors, L.P. ("Oak Hill"), and York Capital Management Global Advisors LLC (collectively with Davidson Kempner, KKR, GoldenTree, Goldman Sachs and Oak Hill, the "Consenting Noteholders"), with a production response date of April 24, 2020 ("04/15/20 Document Requests").  The 04/15/20 Document Requests primarily requested various financial documents concerning the Spin-Off, valuation of the Debtors, those transactions, factors, and documents leading up to the Debtors' bankruptcy, including the execution of the RSA, structure, planning and negotiation of the QHC Litigation Trust, the potential impact of COVID-19, and monies received under the Federal Coronavirus Economic Relief Plan (CARES Act).  *See* Intent to Serve Subpoenas, D.I. 145-48; 150-52.

6.     On April 24, 2020, the Consenting Noteholders all refused to produce any documents, except for their retention policies.  Mudrick's counsel held a meet and confer with the Consenting Noteholders' counsel on April 26, 2020, where Mudrick requested documents uniquely in the possession of the Consenting Noteholders related to the Debtors and the Chapter 11 Cases.  On April 27, 2020, the Noteholders responded that while willing to produce documents related to restructuring transactions with the Debtors and the Litigation Trust, they were unwilling to provide *any* of their internal valuations and recovery analyses.

Notwithstanding that the Noteholders stance on production, to date no agreement has been reached on when documents will be produced to Mudrick.

7.      Similarly, in their responses and objections, the Debtors refused to produce certain whole categories of documents including, but not limited to certain:  financial projections, management reports, business plans, other valuations, third party (including lender/noteholder) communications, documents related to COVID-19 impact, and documents concerning any potential or actual violations of debt agreements from January 1, 2019 through the present.   Mudrick and Debtors' counsel had a meet and confer on April 26 and April 28, 2020.  While the parties discussed potential resolutions and continue to work towards a compromise, no final resolution or agreement on the scope of document production has yet to be reached.

8.      Lastly, Credit Suisse – the one third party who did produce documents – also narrowed the scope of what it will produce.  Mudrick and Credit Suisse had a meet and confer on April 27, 2020, but no final agreement as to the scope of production was agreed to by the parties on that call.

9.      The Debtors and RSA parties have thus obstructed Mudrick, impeding Mudrick's ability to fully assess the Plan and the Debtors' valuation thesis and prepare to put forth evidence to support its Plan objections.  Even without all relevant information, however, it is clear that the Plan is patently unconfirmable.

## PRELIMINARY OBJECTION TO CONFIRMATION OF PLAN

10.      Plan proponents bear the burden of proving that a proposed plan satisfies every applicable confirmation requirement under section 1129(a) of the Bankruptcy Code.  *See In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003) ("The plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in § 1129(a) . . . ."); *In*

*re Quigley Co.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) ("The proponent of confirmation bears the burden of proof by a preponderance of the evidence."). This burden requires careful consideration of each of the relevant provisions of section 1129 of the Bankruptcy Code. *See In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 423 (Bankr. E.D. Pa. 1995) (holding that the court has "an independent duty to ensure that the Plan meets all of the requirements of confirmation"). This is especially so where, as here, a debtor acts as the plan proponent. *See Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) ("The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors.").

11.     Where an impaired class, such as Class 10 (Quorum Interests) here, has been deemed to reject the Plan, "the plan proponent must also show that the plan meets the additional requirements of §1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of the dissenting classes is fair and equitable." *In re Exide Techs.*, 303 B.R. at 58; *see also In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000).

12.     As shown below, it is clear – even before Mudrick receives the discovery to which it is entitled – that the Debtors cannot prove that the Plan satisfies sections 1129(a) and section 1129(b) of the Bankruptcy Code. The Court should therefore deny confirmation of the Plan.

## I.        THE PLAN IS NOT FAIR AND EQUITABLE

13.     The Plan is unconfirmable because:  (i) it wipes out existing equity interests while the Debtors have a total enterprise value that puts equity holders firmly "in the money," and (ii) the Noteholders are receiving more than a 100% recovery on their claims.

14.     Any plan that denies holders of Quorum Interests any recovery is not fair and equitable.  In a non-consensual case such as the Chapter 11 Cases, section 1129(b)(1) of the Bankruptcy Code provides that, if all confirmation requirements of section 1129(a) other than section 1129(a)(8) are met (though they are not here, *see infra*), the court "shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable" with respect to each non-accepting, impaired class of claims or interests.  11 U.S.C. § 1129(b)(1).  Section 1129(b)(2), in turn, describes how a plan may be "fair and equitable" to a class of impaired, non-accepting claims or interests.  11 U.S.C. §1129(b)(2).

15.     With respect to a class of interests, such as Class 10 here, the plan must provide "that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, **or the value of such interest**."  11 U.S.C. § 1129(b)(2)(C)(i) (emphasis added).  One of the "primary consideration[s] for determining whether a plan which extinguishes equity interests is fair and equitable is [therefore] *whether the debtor is solvent*."  *Nw. Village Ltd. P'ship v. Franke (In re Westpointe, L.P.)*, 241 F.3d 1005, 1007 (8th Cir. 2001) (emphasis added); *see also In re Machne Menachem, Inc.*, 371 B.R. 63, 72 (Bankr. M.D. Pa. 2006) ("11 U.S.C. § 1129(b)(2)(C)(i) requires that a plan provide that every class of interest, including stockholders, receive the 'value of such interest.' . . . . *[T]he*

*beneficiaries of this corporation . . . deserve to share the benefits of the net value of the corporate assets*[.]") (emphasis added).

16.     The "fair and equitable" standard further incorporates the "absolute priority rule," which requires (among other things) "that no creditor be paid more than it is owed." 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a]; s*ee Exide Techs.*, 303 B.R. at 61 ("Courts have decided that a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.") (internal quotation marks omitted).

17.     The requirement that no creditor may be paid more than it is owed means that "[o]nce the participant receives or retains property equal to its claim, it may receive no more." 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][ii].  Put differently, no claim or interest holder may be paid a "premium" in excess of the allowed amount of its claim. *Id.*  A plan that proposes to pay unsecured creditors value in excess of their allowed claim amounts is therefore not "fair and equitable" under section 1129(b)(2)(B) of the Bankruptcy Code, and may not be confirmed. *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 242 (Bankr. S.D.N.Y. 2014) ("It's undisputed that the 'fair and equitable' requirement encompasses a rule that a senior class cannot receive more than full compensation for its claims." (quoting *In re Chemtura Corp.*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010))); *In re AbitibiBowater, Inc.*, Case No. 09-11296, 2010 WL 4823839, *12 (Bankr. D. Del. Nov. 22, 2010) ("[S]enior classes cannot receive more than a 100% recovery on their claims."); *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated the junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48 (denying confirmation of plan that afforded secured lenders value in excess of the amount of their claims); *In re Genesis Health*

*Ventures, Inc.*, 266 B.R. at 612 ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

18.    As the Plan proponent, Debtors have the burden to show that the Plan does not afford any class value in excess of the amount of its claim.  *See In re Armstrong World Indus.*, 348 B.R. 111 n.14, 120 (D. Del. 2006) (noting that plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code Section 1129(a) and 1129(b)); 7 Collier on Bankruptcy ¶ 1129.05[1][d] ("If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met.  In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").

19.    Here, the Plan is not fair and equitable under section 1129(b) of the Bankruptcy Code for two independent reasons.  *First*, the total value given to the Noteholders – comprised of (i) the New Common Stock; (ii) the right to purchase new equity; (iii) a 7.5% premium for such right; and (iv) QHC Litigation Trust Interests – results in recovery of more than 100% on the Senior Notes Claims.  *Second*, the Debtors are solvent because the value of the Debtors' assets as of the Effective Date is larger than the Debtors' liabilities.  The Plan – which wipes out existing equity interests without providing them with any recovery – is therefore not fair and equitable. *See In re Exide Techs.*, 303 B.R. at 60-61 ("A determination of [a] Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. §1129(b)."); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("A valuation of the debtor's business is, by virtue of the statutory language, almost a prerequisite to a determination that a plan satisfies the fair and equitable test of §1129(b).").

A.    **The Plan Violates the Absolute Priority Rule by Providing Value to the Noteholders in Excess of the Value of Their Claims**

20.    The absolute priority rule prohibits precisely what the Plan proposes to do – grant a class of creditors more than the total amount of its claims.  The Debtors' flawed valuation attempts to mask the Plan's violation of the absolute priority rule by artificially decreasing the value of the Reorganized Debtors when, in fact, 100% of the New Common Stock itself materially exceeds the amount of the Senior Notes Claims without taking into consideration the other value the Debtors provide to the Noteholders.  The Plan thus violates the key rule that "bankruptcy is not supposed to appropriate some investors' wealth for distribution to others."  *In re UAL Corp.*, 412 F.3d 775, 778 (7th Cir. 2005).

21.    As shown in Protiviti's preliminary analysis, attached hereto as Exhibit A – prepared without the benefit of discovery and solely from information garnered from the Disclosure Statement, the Debtors' letters to the United States Trustee in opposition to the appointment of an Official Equity Committee, and public resources – the uncertain and temporary nature of COVID-19's impact on equity markets should not be taken into account when determining the value of the Reorganized Debtors.  Indeed, health care analysts are valuing companies and advising clients based on 2021 metrics.  The consensus among analysts is that 2021 financial performance will not be impacted by COVID-19 and market values will return to normal.  Based on reasonable projections – and contrary to the Debtors' flawed and artificially depressed valuation – the Debtors will enjoy improved cash flow in the next five years.[8]  After taking into account certain (but not all) CARES Act proceeds (as described in detail below) and NOLs, Protiviti estimates that the enterprise value of QHC is between **$1.64 billion and $1.86**

---

[8]    For the purposes of Protiviti's preliminary analysis and this discussion, Protiviti has used the Debtors' projections annexed to the Disclosure Statement.  Protiviti's and Mudrick's analysis of these projections may change once discovery is obtained.

**billion with a mid-point equity value range of between $343 million and $571 million, which translates into between $10.51 per share and $17.48 per share.**[9]

22.     The Plan fails the absolute priority rule for the additional reason that the Debtors have artificially lowered the projected recovery to Noteholders by failing to value the new equity rights, the premium for such rights, and the QHC Litigation Trust Interests, all of which the Noteholders would receive under the Plan.

23.     The Debtors also ignore the value of all potential QHC Litigation Trust claims against third parties, including in connection with the Community Health Systems spin-off in 2016. In fact, the Debtors have failed to assign such assets any value in the two liquidation analyses they have separately filed with the Court. One must presume that these claims have some value, as evidenced by the creation of an entire trust for their post-confirmation prosecution. Indeed, if those interests were valueless, creditors would never have insisted on establishing the Litigation Trust. The same holds true for the new equity rights and the associated premium.

**B.     The Plan Is Unconfirmable Because It Wipes Out the Equity of Solvent Debtors**

24.     The Chapter 11 Cases were, at the outset, about very short-term liquidity (already completely addressed), not solvency. The Debtors are solvent. Although they expect a brief downtick in earnings due to the worldwide COVID-19 pandemic – like every other company – they expect to recapture these earnings in the second half of 2020 and thereafter. Indeed, in its recent 8-K, QHC itself said "in 2021 and beyond, management does not expect there to be a material impact to the business from COVID-19." *See* Quorum Health Corp., Current Report

---

[9]     Again, Protiviti prepared its preliminary analysis without the benefit of discovery and solely from information garnered from the Disclosure Statement, the Debtors' letters to the United States Trustee in opposition to the appointment of an Official Equity Committee, and public resources. Protiviti's and Mudrick's analysis of these projections may change once discovery is obtained.

(Form 8-K) (Apr. 7, 2020).  Yet, the Debtors and the Noteholders seek to rush to confirmation using a temporary pandemic-related earnings trough to drive an opportunistic false valuation.

25.    Of particular import are the recent actions by the federal government that have markedly and materially increased the Debtors' enterprise value.  The CARES Act Provider Relief Fund, recently increased by $75 billion last week in the Health Care Enhancement Act passed by Congress, now provides $175 billion in grants, not loans, for hospitals and other providers, including the Debtors.  Prior to last week's increase, HHS had already disbursed $30 billion on the basis of providers' 2019 Medicare fee-for-service revenue.  Of this, HHS granted the Debtors $19.2 million or 0.06% of the initial $30 billion distribution – a cash asset the Debtors excluded from their valuation analysis.  While the exact distribution methodology for the remaining $145 billion of grants is not yet fully known, assuming the Debtors receive the same 0.06% distribution for the forthcoming $145 billion, it implies that the Debtors will receive a total of $112 million (another $93 million in addition to the $19.2 million they have already received).

26.    However, we already know the Debtors are likely to receive more.  HHS announced that it is not distributing the funds exactly as it did before, but that of the initial $100 billion Congress authorized, HHS has specifically earmarked $10 billion for "rural health clinics and hospitals[,]" like those the Debtors owns.[10]  These funds are earmarked to begin to be distributed as early as this week.  Mudrick's valuation consultant, Protiviti, estimates that the Debtors will receive over $107-$126 million in grant money from these funds alone.  *See* Ex. A at 11.

---

[10]    HHS Press Release, dated April 22, 2020.

27. Thus, between the $19.2 million received to date and the additional allocation from the $100 billion grant, including the rural hospital earmark, Mudrick believes that the Debtors will receive between $127 million and $146 million, with significant additional funds forthcoming from the remaining $135 billion still to be granted. *See id.* at 12.

28. <u>All in, the Debtors will receive hundreds of millions of dollars that they had no expectation of getting when they signed the RSA and created their valuation analysis</u>.

29. Although Mudrick contends that the Debtors are solvent even without these newfound CARES Act grants, the substantial additional value that the Debtors have and will continue to receive leaves no doubt. Applying widely-accepted market and income valuation methodologies, and using reasonable assumptions and current market data, results in an enterprise value sufficient to pay: (i) all of the Debtors' pre-petition debt obligations; (ii) the projected balance of the Debtors' DIP loan at confirmation; (iii) the Debtors' administrative expenses; and (iv) a return to shareholders.

30. Accordingly, the Court cannot confirm the Plan.

II. **THE PLAN IS UNCONFIRMABLE BECAUSE IT CONTAINS IMPERMISSIBLE THIRD-PARTY RELEASES**

A. **Members of Class 10 Cannot Be Compelled to Affirmatively Opt Out of Third-Party Releases by Filing a Plan Objection**

31. Holders of Quorum Interests are not entitled to any distribution under the Plan, are not entitled to vote on the Plan, and are deemed to reject the Plan.[11] The Plan also purports to burden those shareholders with taking the affirmative step of filing a Plan objection to avoid releasing all claims against numerous, solvent non-Debtor entities, in exchange for absolutely nothing.

---

[11] Plan, at III.B.10.

32.     In *In re Emerge Energy Servs. LP*, Case No. 19-11563 (KBO), 2019 Bankr.

LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019), this Court denied confirmation of a plan that

required certain creditors and interest holders to complete and return an "opt-out" form

indicating their affirmative refusal to release claims against third parties.  Rejecting such

provision, the Court held:

> [I]t cannot be said with certainty that those failing to return a ballot
> or Opt-Out Form did so intentionally to give the third-party
> release, and that is what the Court must find under the law to
> approve a third-party release absent the satisfaction of the
> *Continental* standard [dealing with non-consensual third-party
> releases].

*Id.* at *53.

33.     Similarly, in *In re Washington Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011),

Judge Walrath held that "the opt out mechanism is not sufficient to support the third party

releases . . . particularly with respect to parties who fail to return a ballot (*or are not entitled to

vote in the first place*)."  *Id.* at 355 (emphasis added).

34.     Here, the Debtors seek to impose a far greater burden on equity holders by

requiring members of Class 10 *to file an objection to the Plan* to opt out of the third-party

releases.  There is no authority for the Debtors' unprecedented method of creating consent in the

Third Circuit or this District, and it defies any notion of fairness.  As another court observed

when declining to approve a similarly offensive "consent" mechanism with respect to holders of

claims and interests in impaired, non-voting classes:

> As to creditors and interest holders who were deemed to reject the
> Plan (and therefore were given no opportunity to vote or 'opt in' to
> the releases): it would defy common sense to conclude that those
> parties had 'consented' to releases. Voting creditors who chose to
> reject the Plan are not bound by the releases unless they 'opted in'
> to them. *Creditors and interest holders who were deemed to reject
> the Plan should similarly be deemed to have rejected the third
> party releases in the absence of an affirmative act manifesting a*

*contrary consent.* Since no 'opt in' mechanism was provided for creditors and interest holders who were deemed to have rejected the Plan, those parties have not 'consented' to the proposed third party releases.

*In re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) (emphasis added).

35.     The Debtors' improper attempt to bind shareholders in an impaired, non-voting class to third-party releases by compelling them to affirmatively opt out of such releases, by filing a Plan objection to preserve their claims against numerous non-Debtor entities serves no legitimate reorganizational purpose other than to disenfranchise shareholders and protect the Debtors' directors, officers (both current and former), Noteholders, and other third parties from their independent liability to shareholders.  The Plan is unconfirmable for this reason alone.

### B.    The Plan Notice Contains Insufficient Information for Class 10 Members to Understand the Scope and Consequences of the Third-Party Releases

36.     On April 13, 2020, the Court entered the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, (III) Directing that a Meeting of Creditors Not Be Convened, (IV) Waiving the Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities, and (V) Granting Related Relief* [D.I. 137]. Pursuant to that order, the Debtors are not required to mail a copy of the Plan or the Disclosure Statement to Holders of Claims that are "Impaired and deemed to reject the Plan."

37.     On the same date, the Debtors published the *Notice of (I) Commencement of Prepackaged Chapter 11 Bankruptcy Cases, (II) Combined Hearing on the Disclosure Statement, Confirmation of the Joint Prepackaged Chapter 11 Plan, and Related Matters, and (III) Related Objection and Briefing Deadlines* [D.I. 137-1] (the "Plan Notice").  The Plan Notice advises its recipients that "the Plan contains certain release, exculpation, and injunction

17

provisions," copying and pasting the dense and confusing definitions and provisions from the Plan concerning the third-party releases.

38.    The Third-Party Releases cannot be approved with respect to Class 10 members because the Plan Notice fails to describe the releases or their impact to ordinary holders in any detail.  Moreover, the Plan Notice completely obfuscates the procedure a Class 10 member must follow to opt out of the third-party releases, requiring Class 10 members – who are receiving nothing under the Plan and are not entitled to vote – to not only read a notice from the Debtors, but also locate and review other complex documents such as the Plan and Disclosure Statement.

39.    Further, the Disclosure Statement (which the Debtors have not distributed to equity holders) lacks basic information required for parties to adequately assess whether such releases are prudent.

40.    This convoluted procedure is the antithesis of due process.  It is axiomatic that a court cannot alter the rights of parties who have not been given due process in the form of adequate notice and a fair opportunity to object.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314-15 (1950).  In *Mullane*, the Supreme Court held that

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. . . . The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance.

*Id.* at 314 (internal citations omitted).

41.    The Court should not confirm the Plan for this additional reason.

III.    **ADDITIONAL OBJECTIONS TO PLAN CONFIRMATION**

42.    Even without the benefit of discovery from the Debtors and the RSA parties,

Mudrick has identified additional fatal flaws in the Plan that render it unconfirmable, including:

- The Plan does not comply with the applicable provisions of title 11 pursuant to section 1129(a)(1) of the Bankruptcy Code because, as described above and among other reasons, it contains impermissible third-party releases.[12]

- The Debtors do not comply with the applicable provisions of title 11 pursuant to section 1129(a)(2) of the Bankruptcy Code because, as shown below, the Debtors have failed to comply with the disclosure requirements under section 1125 of the Bankruptcy Code.[13]

- The Plan has not been proposed in good faith, in violation of section 1129(a)(3) of the Bankruptcy Code. *First*, the Debtors should have exercised their "fiduciary out" and terminated the RSA, especially in light of the fact that it is based on a valuation that is no longer tethered to reality considering the additional grants that the Debtors will receive under the CARES Act Provider Relief Fund. *Second*, far from proposing the Plan with honesty and good intentions,[14] the Debtors have failed to include the CARES Act grants and projections in an updated valuation analysis, negotiated a depressed valuation with the Noteholders, and have also failed to update the Disclosure Statement to disclose the additional grants that will be received. *Third*, the Debtors failed to disclose in real time an amendment to the Initial Indenture, **dated February 6, 2020**, by which the Debtors became allowed to offer consideration to individual Noteholders as inducement to any consent, waiver or amendment of the indenture, without offering such consideration to all Noteholders. That the Debtors first disclosed this important amendment – which was presumably executed to facilitate the RSA – **on April 10, 2020** (as part of the Debtors' 10-K filing), shows that the Debtors tried to conceal how long and how closely they had been working with the Noteholders. It also raises serious questions as to whether the treatment described in the Plan reflects the total consideration provided to the Noteholders. The Debtors' concealment is the antitheses of "honesty and good intentions." If nothing else, the amendment proves that the Noteholders recognized that they were affiliates of the Debtors and that without this change, they could not vote their Notes.

---

[12]    *In re Keller*, 157 B.R. 680, 686 (Bankr. E.D. Wash. 1993) (plan violated section 1129(a)(1) where it contained unlawful releases).

[13]    *In re Aleris Int'l, Inc.*, Case No. 09-10478, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("The legislative history of section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 . . . of the Bankruptcy Code.").

[14]    *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (holding that the good faith standard requires that the plan be "proposed with honesty, good intentions, and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code").

43.     Mudrick reserves the right to articulate these objections, as well as other and further objections derived from discovery, in more detail at a future date.

## PRELIMINARY OBJECTION TO APPROVAL OF DISCLOSURE STATEMENT

44.     The Court should not approve the Disclosure Statement for two independent reasons:  (i) it fails to provide adequate information and (ii) it describes a plan that is patently unconfirmable.

## I.      THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT FAILS TO PROVIDE ADEQUATE DISCLOSURE

45.     Section 1125(b) of the Bankruptcy Code requires a plan proponent to furnish creditors with "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" in order to solicit acceptances or rejections of a proposed chapter 11 plan.  11 U.S.C. § 1125(b).  "Adequate information" is defined in the Bankruptcy Code as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

46.     Critical to the reorganization process is meaningful disclosure sufficient to enable stakeholders to make an informed decision about whether to accept or reject a proposed plan of reorganization.  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").

47.     The provision of adequate information is at the very heart of the reorganization process. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("Given the necessity for adequate information in the Disclosure Statement and the paramount position section 1125 occupies in the Chapter 11 process, there is little, if any, room for harmless error."). A court should examine each disclosure individually to discern whether the Bankruptcy Code's "adequate information" requirement is satisfied. *See In re Worldcom, Inc.*, Case No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) ("[T]he approval of a disclosure statement . . . involves a fact-specific inquiry into the particular plan to determine whether it possesses 'adequate information' under § 1125.").

48.     In order for a disclosure statement to provide "adequate information," it must list "the assets of the bankruptcy estate and their value." *In re Phoenix Petroleum Corp.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001). "[T]he normal topics for inclusion in a disclosure statement" include, among other things, "a description of the available assets and their value." *Id.* at 393 n.6; *see also In re Dakota Rail, Inc.*, 104 B.R. 138, 147 (Bankr. D. Minn. 1989) ("Because the knowledge of a debtor's financial condition is essential before any informed decision concerning the merits of a chapter 11 plan can be made, it is vital, if not a prerequisite, that a description of available assets, their value, and certainly their ownership be disclosed under § 1125.").

49.     As shown below, the Disclosure Statement fails to provide *any* information – let alone "adequate information" – concerning two crucial assets:  (i) the claims the Debtors will contribute to the QHC Litigation Trust and (ii) additional grants that the Debtors will receive from the CARES Act Provider Relief Fund.

A.    **The Disclosure Statement Fails To Provide Any Information Relating to the QHC Litigation Trust**

50.    A debtor's obligation to disclose the value of all assets administered by a plan extends to the valuation of estate litigation claims.  *See Shandler v. DLJ Merch. Banking, Inc. (In re Insilco Tech., Inc.)*, 330 B.R. 512, 525 (Bankr. D. Del. 2005) (holding that a "Disclosure Statement concerning post-confirmation litigation does not provide any notice to creditors" where it did not "specifically identif[y] the claims against the defendants as an asset to be liquidated and distributed to creditors"); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 56 (S.D.N.Y. 1999) (finding a disclosure statement was inadequate where it included only "vague references to the Claims" and did not "disclose the substance, nature and value of the Claims"); *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 103 (S.D. Tex. 1993) ("A claim with potential is a potential asset.  The creditors have a right to know what the debtor's assets are even though the potential may be contingent, dependent, or conditional. . . . The code requires adequate disclosure, not selective disclosure.").

51.    Here, the Debtors have failed to disclose any information regarding the claims that the QHC Litigation Trust will administer, including those related to the Community Health Systems spin-off in 2016.  As described above, the Plan provides that the Debtors will distribute the entirety of these assets to the Noteholders as additional value over and above 100% of the equity.  Of course, the potential value of these assets must be taken into account in any valuation analysis and must be disclosed to the Debtors' stakeholders.  Yet, the Disclosure Statement provides no information that would allow any party in interest to value such claims and evaluate whether such treatment is appropriate.  Tellingly, the Debtors have refused to produce documents from 2016, during the relevant timeframe of the Spin-Off.

52.     Strikingly, in one of their letters to the United States Trustee objecting to the formation of an Official Equity Committee, the Debtors made the new assertion – which they failed to disclose in the Disclosure Statement – that the claims assigned to the QHC Litigation Trust have "no material value."  This assertion not only strains credulity – the Debtors would not create a trust to administer claims with no material value – but also highlights the fact that the Disclosure Statement provides no information concerning those claims.  The Debtors disclosed more information privately to the United States Trustee than they did publicly to the Court and to their stakeholders.

53.     Similarly, the Debtors provide no valuation of the rights to acquire new equity provided to the Noteholders and the 7.5% premium for such rights.

54.      The Court should not approve the Disclosure Statement for this reason alone.

**B.     The Disclosure Statement Fails To Provide Any Information Relating to Additional Grants Under the CARES Act Provider Relief Fund**

55.     As described in detail above, the CARES Act Provider Relief Fund, now provides $175 billion in grants for hospitals and other providers, including the Debtors.  The Debtors may therefore receive hundreds of millions of dollars that they had no expectation of getting when they signed the RSA and when MTS conducted its valuation analysis.  Far from listing "the assets of the bankruptcy estate and their value" – which may now include the foregoing grants – the Disclosure Statement does not provide any information in connection therewith.  *See Phoenix Petroleum*, 278 B.R. at 393.

56.     In addition, the Disclosure Statement tellingly fails to discuss the potential funds the Debtors might forgo by virtue of going forward with the RSA and restructuring process, including the Company's ability to receive the maximum amount of liquidity from funds already available under the Medicare Accelerated and Advance Payment Programs.

57.     Each dollar of CARES Act funds received by the Debtors increases their enterprise value by the same amount.  Therefore, the Debtors lack of disclosure regarding this issue is a critical flaw given how dependent the Plan is on proving a specific enterprise valuation to deprive equity holders of any distribution.  The Court should not approve the Disclosure Statement for this ongoing fatal omission.

## II.      THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT DESCRIBES A PATENTLY UNCONFIRMABLE PLAN

58.     It is well settled that a court must not approve a disclosure statement where the plan to which it relates is not confirmable on its face.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that . . . the plan described by the disclosure statement is patently unconfirmable . . . ."); *see also Phoenix Petroleum*, 278 B.R. at 394 ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the [c]ourt will not subject the estate to the expense of soliciting votes and seeking confirmation.").

59.     As discussed above, the Plan has at least two fatal flaws that render it unconfirmable:  (i) it fails to satisfy section 1129(b) of the Bankruptcy Code because it is not "fair and equitable"; and (ii) it contains impermissible third-party releases.  On these bases alone, the Court should not approve the Disclosure Statement.

## RESERVATION OF RIGHTS

60.     Mudrick reserves the right to file and present other and further objections to confirmation of the Plan and to the adequacy of the Disclosure Statement, including other and

further objections derived from discovery, in more detail at a future date.

[*Remainder of page intentionally left blank*]

## CONCLUSION

Wherefore, Mudrick respectfully requests that this Court deny confirmation of the Plan, deny approval of the Disclosure Statement, and grant Mudrick such other relief as is just and proper.


Dated: April 29, 2020
        Wilmington, Delaware

/s/ *Robert J. Dehney*
Robert J Dehney (No. 3578)
Joseph C. Barsalona II (No. 6102)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:   rdehney@mnat.com
            jbarsalona@mnat.com

- and -

David S. Rosner (admitted *pro hac vice*)
Howard W. Schub (admitted *pro hac vice*)
Matthew B. Stein (admitted *pro hac vice*)
Shai Schmidt (admitted *pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email:   drosner@kasowitz.com
            hschub@kasowitz.com
            mstein@kasowitz.com
            sschmidt@kasowitz.com

**COUNSEL FOR MUDRICK CAPITAL
MANAGEMENT, L.P.**